## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION AT DAYTON

**DOMINIC'S RESTAURANT OF DAYTON,**
**INC., et al.,**

                **Plaintiffs,**

**-v-**

**CHRISTIE L. MANTIA, et al.,**

                **Defendants.**

**Case No. 3:09-cv-131**

**Judge Thomas M. Rose**

---

### ENTRY AND ORDER GRANTING PLAINTIFFS' MOTION FOR A TEMPORARY RESTRAINING ORDER (Doc. #5)

---

This matter arises from the alleged illegal use of Plaintiffs' marks and trade secrets by one or all of the Defendants. The Plaintiffs in this action are Dominic's Restaurant of Dayton, Inc. ("Dominic's"), Dominic's Foods of Dayton, Inc. ("Dominic's Foods") and Anne B. Mantia ("Anne Mantia"). The Defendants are Christie L. Mantia ("Christie Mantia"), Reece Powers III ("Powers"), Harry Lee ("Lee") and Dominic's Restaurant, Inc. ("DRI").

Plaintiffs' Complaint brings ten causes of action. Count I is a federal claim against all of the Defendants for mark infringement. Count II is a federal claim against all Defendants for unfair competition, false designation of origin, passing off and false advertising. Count III is a federal claim against all Defendants for trademark dilution. Count IV is a claim brought pursuant to Ohio law against all Defendants for deceptive and unfair trade practices. Count V is a claim brought pursuant to Ohio law for unfair competition. Count VI is against all Defendants for tortious interference with a prospective/contractual business advantage and conspiracy to interfere with contractual business relations and to misappropriate Plaintiffs' methods of

operations. Count VII is against all Defendants for conversion and unjust enrichment. Count VIII is against all Defendants for misappropriation of business property in violation of the Ohio Uniform Trade Secrets Act ("OUTSA"). An unnumbered Count is against Christie Mantia for breach of contract. Count IX is against Christie Mantia for fraudulent and/or negligent misrepresentation. Finally, Count X of Plaintiffs' Complaint is against Christie Mantia for breach of implied covenant of good faith and fair dealing. Plaintiffs' Complaint has been served on all of the Defendants.

Plaintiffs filed a Verified Ex Parte Motion for Temporary Restraining Order ("TRO"). (Doc. 5.) A hearing on the TRO was initially scheduled for April 10, 2009, but was reset for April 14, 2009, based upon Defendants' representations to the Court that they would be obtaining counsel and wished to be heard at the hearing.

On April 14, 2009, the counsel obtained by Defendants DRI, Lee and Powers responded in writing to Plaintiffs' Motion for a TRO. (Doc. #6.) In this response, these Defendants argue that this Court does not have subject matter jurisdiction over Plaintiffs' Complaint and that Plaintiffs' Motion for a TRO is otherwise without merit.

Also, on April 14, 2009, the hearing was conducted at which all parties were represented by counsel. The Parties presented argument regarding subject matter jurisdiction and argument regarding the merits of a TRO. The Plaintiffs were given until noon on April 15, 2009, to submit a brief regarding subject matter jurisdiction and the Defendants were given until midnight on April 15, 2009, to reply. This they did.

Although the arguments regarding subject matter jurisdiction presented by DRI, Lee and Powers and joined by Christie Mantia are not in the form of a motion, this Court can and must

examine its subject matter jurisdiction sua sponte. *See Franzel v. Kerr Mfg. Co.,* 959 F. 2d 628, 630 (6th Cir. 1992). Therefore, subject matter jurisdiction will first be addressed.

## I.      SUBJECT MATTER JURISDICTION

The relevant legal provisions regarding subject matter jurisdiction will first be set forth. This will be followed by an analysis of subject matter jurisdiction in this case.

## A.      Legal Provisions Regarding Subject Matter Jurisdiction

Federal courts are courts of limited jurisdiction;  they are empowered to hear only those cases which are within the judicial power of the United States as defined in the United States Constitution and as further granted to them by Act of Congress.  Therefore there is a presumption that a federal court lacks jurisdiction until it has been demonstrated. *Turner v. Bank of North America,* 4 U.S. 8 (1799).  Facts supporting subject matter jurisdiction must be affirmatively pled by the person seeking to show it.  *Bingham v. Cabot,* 3 U.S. 382 (1798).  The burden of proof is on the party asserting jurisdiction if it is challenged.  *McNutt v. General Motors Acceptance Corp. of Indiana*, 298 U.S. 178 (1936).

District Courts have subject matter jurisdiction over civil actions between citizens of different states. 28 U.S.C. § 1332(a)(1). This type of subject matter jurisdiction is termed "diversity jurisdiction." No plaintiff and no defendant may be citizens of the same state. *Wisconsin Department of Corrections v. Schacht*, 524 U.S. 381, 388 (1998).

In this case, the Plaintiffs and Defendants are citizens of the same state. Therefore, this Court does not have diversity jurisdiction over Plaintiffs' Complaint.

District Courts also have subject matter jurisdiction over all civil actions arising under the Constitution, laws or treaties of the United States. 28 U.S.C. § 1331. This type of subject

matter jurisdiction, termed "federal question jurisdiction," formed the basis for the filing of this action in federal court.

Determining whether a case arises under federal law is a very difficult question. Wright, Miller & Cooper, *Federal Practice and Procedure*: Civil § 3562. Several tests have been employed. If federal law creates the cause of action, then the case arises under federal law. *American Well Works Co. v. Layne & Bowler Co.,* 241 U.S. 257 (1916)(Holmes, J.). However, this test is more useful for inclusion than for exclusion. "Leading commentators have suggested that for purposes of §1331 an action "arises under" federal law 'if in order for the plaintiff to secure the relief sought he will be obliged to establish both the correctness and the applicability to his case of a proposition of federal law.'" *Franchise Tax Board v. Construction Laborers Vacation Trust*, 463 U.S. 1 (1983), quoting P. Bator, P. Mishkin, D. Shapiro & H. Wechsler, *Hart & Wechsler's The Federal Courts and the Federal System* 889 (2d ed. 1973). The Court concluded in *Franchise Tax Board* that the district courts have jurisdiction to hear "only those cases in which a well-pleaded complaint establishes either that federal law creates the cause of action or that the plaintiff's right to relief necessarily depends on resolution of a substantial question of federal law." 463 U.S. at 27-28.

The question whether a claim arises under federal law is determined according to the "well-pleaded complaint" rule. *Merrell Dow Pharmaceuticals, Inc. v. Thompson,* 478 U.S. 804, 808 (1986). Courts must determine whether the complaint raises a *substantial* federal question. That standard is easily met and an arguably plausible claim must be allowed to proceed. *In re Bendectin Litigation*, 857 F. 2d 290, 300 (6th Cir. 1988)(citing *Robbins v. Reagan*, 780 F. 2d 37, 43 (D.C. Cir. 1985), *cert. denied*, 488 U.S. 1006 (1989)). *Merrell Dow* holds that the

incorporation of federal elements in a state cause of action does not make the claim arise under federal law.

**B.      Analysis**

In this case, federal question jurisdiction, if it exists, must be found in Plaintiffs' claims based upon a trademark and a service mark. Plaintiffs' other claims are brought pursuant to state law.

Plaintiffs' Complaint identifies two marks that could allegedly be infringed. One is the mark "Dominic's" and the other is the mark "Anna Mantia." The Plaintiffs do not alleged that the "Anna Mantia" mark is being violated. Thus, the Court must determine if the "Dominic's" mark is entitled to protection under federal trademark law.

Plaintiffs allege that one or more of the Defendants are or may be about to infringe on two types of the "Dominic's" mark. One is a trademark and one is a service mark. (Compl. ¶ 52.)

A service mark is a word or combination of words used to identify and distinguish a particular service as being the labors of a unique source. *Dial-A-Mattress Operating Corp. v. Mattress Madness, Inc.*, 841 F. Supp. 1339, 1345 (E.D.N.Y. 1994). A trade mark is a word or combination of words used to distinguish particular goods or products. 15 U.S.C. § 1127. Thus, a service mark functions to identify and distinguish the source and quality of an intangible service, a trademark serves to identify and distinguish the source and quality of a tangible product. *Dial-A-Mattress*, 841 F. Supp. at 1345 (citing 2 J. Thomas McCarthy, *Trademarks and Unfair Competition* § 19.29(1) at 19:134 (3d ed. 1992)). Further, both a service mark and a trademark are governed by identical standards. *West & Company, Inc. v. Arica Institute, Inc.*, 557 F.2d 338,

340 n.1 (2d Cir. 1977).

The ownership of a service mark is not acquired by federal or state registration. *Homeowners Group, Inc. v. Home Marketing Specialists, Inc.*, 931 F.2d 1100, 1105 (6th Cir. 1991). Ownership rights of a service mark flow only from prior appropriation and actual use. *Id.* Yet, registration of a service mark is at least prima facie evidence of the registrant's ownership and exclusive right to use the mark. *Id.* Finally, ownership of a mark confers both the right to use the mark and the right to prevent others from using the same or a confusingly similar mark. *Id.* at 1106.

Federal trademark law protects registered marks and qualifying unregistered marks. *Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 768 (1992); *Dial-A-Mattress*, 841 F. Supp. at 1345. Further, the general principles qualifying a mark for registration under § 2 of the Lanham Act are, for the most part, applicable in determining whether an unregistered mark is entitled to protection. *Id.*

One of the applicable principles is that service marks must be used in commerce before they are entitled to protection. See *Larry Harmon Pictures Corp. v. Williams Restaurant Corp.*, 929 F.2d 662, 664 (Fed. Cir. 1991, *cert. denied*, 502 U.S. 823 (1991). Chapter 15 U.S.C. § 1127 defines "use in commerce" as:

> the bona fide use of a mark in the ordinary course of trade, and not made merely to reserve a right in a mark. For purposes of this chapter, a mark shall be deemed to be in use in commerce –
>
> (1) on goods when –
>
> (A) it is placed in any manner on the goods or their containers or the displays associated therewith or on the tags or label affixed thereto, or if the nature of the goods makes such placement impracticable, then on documents associated with the goods or their sale, and

(B) the goods are sold or transported in commerce, and

(2) on services when it is used or displayed in the sale or advertising of services and the services are rendered in commerce, or the services are rendered in more than one State or in the United States and a foreign country and the person rendering the services is engaged in commerce in connection with the services.

15 U.S.C. § 1127. Federal courts have determined that this definition of "use in commerce" means use in interstate commerce. *Johnson v. Jones*, 149 F.3d 494, 502 (6th Cir. 1998); *Future Lawn, Inc. v. Maumee Bay Landscape Contractors, L.L.C.*, 542 F. Supp. 2d 769, 779 (N.D. Ohio 2008); *Savannah College of Art and Design, Inc. v. Houeix*, 369 F. Supp. 2d 929, 942 (S.D. Ohio 2004); *Mountain Top Beverage Group, Inc. v. Wildlife Brewing N.B., Inc.*, 338 F. Supp. 2d 827, 833 (S.D. Ohio 2003).

In this case, at least two issues have been raised as to whether the trademark "Dominic's" is subject to protection under federal laws. First, a review of the United States Patent and Trademark website, www.uspto.gov, reveals that there are at least twenty (20) federally registered trademarks that are not cancelled, abandoned or expired using or including the term "Dominic's."

Second, Anne Mantia has expressly disclaimed use of the "Dominic's" trademark outside the Dayton area. A newspaper article found on the website www.annamantia.com says, "Trademark restrictions limit their use of the Dominic's name outside of the Dayton area, so all their products will be branded under the Anna Mantia trademark."

Thus, the Court will not further consider whether the "Dominic's" trademark is entitled to the protection of federal trademark laws for purposes of subject matter jurisdiction. However, whether the "Dominic's" service mark is entitled to protection will be considered. Powers, Lee and DRI argue that the "Dominic's" service mark is not entitled to the protection of federal

trademark laws because they (Powers, Lee and DRI) have not used this service mark in commerce and because the Plaintiffs have not used this service mark in interstate commerce.

**1.      Use of "Dominic's" Service Mark By Powers, Lee and DRI**

There is evidence of an article appearing in the Dayton Daily News on March 18, 2009, regarding the "Dominic's" service mark. The article indicates that a new restaurant, as yet unnamed, operated by Lee, Powers and Christie Mantia will open in West Carrollton, Ohio. The new restaurant will, according to the article, feature "the original recipes" from Dominic's. Thus, there is evidence that Powers, Lee and Christie Mantia have already used the "Dominic's" service mark. Powers, Lee and DRI argue that the articles are not a press release prepared by them or based upon a press release prepared by them. However, the information contained in the articles presumably was provided by them. Thus, Powers, Lee and Christie Mantia have already used the "Dominic's" service mark and may be intending to use it in the future.

**2.      Use of "Dominic's" Service Mark In Interstate Commerce By Plaintiffs**

In this case there are factual allegations that the "Dominic's" mark was and is being used in interstate commerce. Dominic's Restaurant served clients for twenty-seven years. (Affirmation of Anne B. Mantia ("Anne Mantia Aff.") Apr. 15, 2009.) During this time Dominic's Restaurant served "substantial numbers" of clients from "throughout the country." (Id.) Further, a substantial portion of the food and supplies used by Dominic's Restaurant moved in interstate commerce. (Id.) Dominic's Restaurant also used media advertising that reached outside of Ohio. (Id.) Finally, the Anna Mantia label dressings that include a Dominic's logo are currently being marketed interstate. (Id.)

It is not required that services be rendered in more than one state to satisfy the use in

commerce requirement. *Larry Harmon*, 929 F.2d at 666. A single-location restaurant rendering services to customers traveling across state boundaries is enough. *Id.* Therefore, the "Dominic's" service mark is used in interstate commerce.

**3.    Continuous Use In Interstate Commerce**

Powers, Lee and DRI also argue that Plaintiffs are required to and have not established continuous use of the "Dominic's" service mark in restaurant services. *See, e.g. Homeowners Group*, 931 F.2d at 1105. This argument is based on the fact that Dominic's restaurant was closed on July 1, 2007.

The user who first appropriates the mark has an enforceable right to exclude others from using it. *La Societe Anonyme des Parfums le Galion v. Jean Patou, Inc.*, 495 F.2d 1265, 1271 (2d Cir. 1974). However, the right to use a mark exclusively derives from its subsequent use in the marketplace. *Id.*

A mark is considered to be abandoned when its use has been discontinued with an intent not to resume. *Silverman v. CBS Inc.*, 870 F.2d 40, 45 (2d Cir. 1989)(citing 15 U.S.C. § 1127), *cert. denied*, 492 U.S. 907 (1989). Intent not to resume may be inferred from the circumstances. *Id.*

For a service mark to have been deemed to be abandoned through non-use, the party asserting abandonment has the burden of proving non-use coupled with an intent not to resume commercial use within a reasonable time. *Id.* Further, non-use for three consecutive years is prima facie abandonment. 15 U.S.C. § 1127.

In this case, there is evidence that the "Dominic's" service mark has been used and has not been abandoned. The "Dominic's" service mark is being used on the Anna Mantia line of

pasta sauce and salad dressing which was allegedly first released on May 1, 2008.

As for intent, Anne Mantia said in a newspaper article dated October 21, 2007, that she intends to open a new Dominic's in the future. Another article dated June 3, 2008, reports that the City of Dayton has discussed the possibility of opening a new Dominic's restaurant across from the Air Force Museum in Riverside, Ohio.

Finally, Dominic's restaurant has been closed for less than the three years required to satisfy a presumption that the service mark has been abandoned. Thus, Powers, Lee and DRI have not met their burden that the "Dominic's" service mark has not been used or that the service mark has been abandoned.

## C.      Conclusion Regarding Subject Matter Jurisdiction

This Court has federal question subject matter jurisdiction over Plaintiffs' claims that Defendants have infringed on the "Dominic's" service mark. The "Dominic's" service mark is protected by federal trademark law. It exists,  it has been used in interstate commerce and it has not been abandoned. As a resulting of having federal question subject matter jurisdiction over one of Plaintiffs' claims, this Court has pendant jurisdiction over Plaintiffs' remaining claims. Having satisfied itself that it has subject matter jurisdiction, the Court moves to an analysis of Plaintiffs' Ex Parte Motion for a Temporary Restraining Order. (Doc. #5.)

## III.     TEMPORARY RESTRAINING ORDER

The legal provisions relevant to consideration of a TRO will first be set forth. This will be followed by an analysis of Plaintiffs' Motion.

## A.      Relevant Legal Provisions

When considering a motion for a temporary restraining order or a preliminary injunction,

courts balance four factors. *Tumblebus Inc. v Cranmer*, 399 F.3d 754, 759 (6th Cir. 2005)(citing *PACCAR Inc. v TeleScan Techs., L.L.C.*, 319 F.3d 243, 249 (6th Cir. 2003)). The four factors to be balanced are: (1) whether the movant has a strong likelihood of success on the merits; (2) whether the movant would suffer irreparable injury without the injunction; (3) whether the issuance of the injunction would cause substantial harm to others; and (4) whether the public interest would be served by issuance of the temporary restraining order or preliminary injunction.[1] *Id.* As the party seeking a restraining order, the Plaintiffs have the burden of persuasion on each of these factors. *Stenberg v. Cheker Oil Co.*, 573 F.2d 921, 925 (6th Cir. 1978).

These four factors are to be balanced - not all four need be met. *Worthington Foods, Inc. V. Kellogg Co.*, 732 F. Supp. 1417, 1428 (S.D. Ohio 1990). For example, in a Lanham Act case, a movant may merit preliminary injunctive relief by showing irreparable harm and either a likelihood of success on the merits or "sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly toward the party requesting the preliminary relief. *Id.*(citing *Frisch's Restaurants, Inc. v. Elby's Big Boy, Inc.*, 670 F.2d 642, 651 (6th Cir. 1982), *cert. denied*, 459 U.S. 916 (1982)).

**B.      Likelihood of Success On the Merits**

Plaintiffs argue that they are entitled to a preliminary injunction on their mark

---

[1]The factors to be considered for a permanent injunction are slightly different. A plaintiff seeking a permanent injunction must demonstrate: (1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction. *eBay, Inc. v. MercExchange*, L.L.C., 547 U.S. 388, 391 (2006).

infringement claims, on their breach-of-contract claim regarding the Share Redemption Agreement; and on their claim brought under Ohio's Uniform Trade Secrets Act. Thus, to obtain an injunction, they must show a likelihood of success on the merits of these claims.

## 1.    Mark Infringement

A section of the Lanham Act, specifically 15 U.S.C. § 1125(a), provides a federal cause of action for infringement of marks and trade dress that have not obtained federal registration. *Tumblebus*, 399 F.3d at 760-61. When considering a claim for infringement of an unregistered mark, a court must determine whether the mark is protectable and, if so, whether there is a likelihood of confusion as a result of the would-be infringer's use of the mark. *Id.*

## a.    Protectability

The protectability of a mark depends upon the level of the mark's distinctiveness. *Id.* at 761. "Suggestive, arbitrary and fanciful marks are inherently distinctive and are protectable so long as the putative owner has actually used the mark. *Id.* "Merely descriptive marks are not 'inherently distinctive,' but can become protectable by developing a secondary meaning." *Id.* Generic marks receive no protection.[2] *Id.*

A suggestive mark suggests rather than describes an ingredient or characteristic of the goods or services and requires the observer to use imagination and perception to determine the nature of the goods. *Id.* at 762 n.5. An arbitrary mark has a significance recognized in everyday life, but the thing it normally signifies is unrelated to the product or service to which the mark is attached. *Id.* n.6. Examples of arbitrary marks are CAMEL cigarettes and APPLE computers. *Id.*

---

[2]Powers and DRI cite the *Homeowners* case, 931 F.2d 1100, for the requirements to show violation of an unregistered mark. The requirements set forth in *Homeowners* are essentially the same as those set forth in *Tumblebus* and used herein.

A fanciful mark is a combination of letters or symbols signifying nothing other than the product or service to which the mark has been assigned. *Id.* n.7.  Examples of arbitrary marks are EXXON and KODAK. *Id.* Finally, a merely descriptive mark often identifies a characteristic of the thing and is very similar to an adjective.  *Id.* n. 8.

I.      **Owner**

There is a likelihood that Plaintiffs own the "Dominic's" marks. For over fifty years, Dominic's has been a leading Italian food business in the greater Dayton area, marketing Italian-related foods, sauces and dressings, and previously operating a restaurant in Dayton, Ohio. (Verified Ex Parte Motion for Temporary Restraining Order ("Motion")). Dominic Mantia, the founder of Dominic's, opened Dominic's restaurant on March 17, 1957. (Motion.) Dominic Mantia was helped by his son Dick and Dick's wife, Anne Mantia, in the operation of the restaurant. (Motion.) Following the deaths of Dominic and Dick, Anne Mantia has continued to guide the company.

In 2005, Christie Mantia, Dominic's granddaughter, sold her interest in the business to Anne B. Mantia. (Motion Ex. B.) Anne Mantia is currently the President of Dominic's Restaurant of Dayton, Inc and Dominic's Foods of Dayton, Inc. d/b/a Dominic's. (Anne Mantia Aff.)

ii.      **Actual Use**

There is a likelihood that Plaintiffs have used and are using the Dominic's marks. The use in commerce of the Dominic's marks is more fully discussed above.

iii.      **Distinctiveness**

Personal names, including both surnames and first names are generally regarded as descriptive terms which require proof of secondary meaning. *815 Tonawanda Street Corp. v.*

*Fay's Drug Co., Inc.*, 842 F.2d 643, 648 (2d Cir. 1988). Secondary meaning has been defined as "[t]he power of a name or other configuration to symbolize a particular business, product or company." *Id.* at 647(quoting *Dallas Cowboys Cheerleaders, Inc. v. Pussycat Cinema, Ltd.*, 604 F.2d 200, 203 n.5 (2d Cir. 1979)). Said another way, a mark has acquired secondary meaning when its use has been uniquely associated with a specific source. *Two Pesos*, 505 U.S. at 766 n.4.

In *Tumblebus*, the Sixth Circuit set forth seven (7) factors that a court is to consider when determining whether a particular mark has acquired a secondary meaning. 399 F.3d at 762. These factors were set forth in the context of a determination of whether to grant a preliminary injunction. The issue before the Court here, however, is whether to grant a TRO. In the context of determining whether to grant a TRO, the Court will look only to the definition of secondary meaning and whether the use of the marks in this case have been uniquely associated with a specific source.

It is clear from the evidence presented that the Dominic's marks at issue in this case have been uniquely associated with Dominic's restaurant, a specific source. The Dominic's marks at issue in this case symbolize a particular business and the products and services associated with that particular business. There is evidence before the Court that Dominic's was a "leading" Italian food business located in the Dayton area marketing Italian-related foods, sauces and dressings. (Motion.) Dominic's restaurant provided high quality Italian cuisine at reasonable prices while maintaining the highest standards of business ethics. (Motion.) Therefore, for purposes of a TRO, the Dominic's marks have acquired a secondary meaning.

**b.      Likelihood of Confusion**

To recover on an unregistered mark infringement claim, a mark's owner must establish not only that the mark is protectable, but also that the use of the mark by the opposing party is likely to cause confusion. *Tumblebus*, 399 F.3d at 763. When considering the likelihood of confusion, the court is to balance the following eight (8) factors: (1) the strength of the plaintiff's mark; (2) the relatedness of the goods; (3) the similarity of the marks; (4) evidence of actual confusion; (5) marketing channels used; (6) the likely degree of purchaser care; (7) the defendant's intent in selecting the mark; and (8) the likelihood of expansion of the product lines. *Id.*(citing *Frisch's*, 670 F.2d at 648. These factors are simply a guide and imply no mathematical precision. *AutoZone, Inc. v. Tandy*, 373 F.3d 786, 793 (6th Cir. 2004). Not all of these factors may be helpful in each case. *Id.*

## I.       Strength of Plaintiffs' Mark

"The strength of a mark is a factual determination of the mark's distinctiveness." *AutoZone*, 373 F.3d at 793. "A mark is strong and distinctive when the public readily accepts it as the hallmark of a particular source; such acceptance can occur when the mark is unique, when it has received intensive advertisement or both." *Id.*(citing *Daddy's Junky Music Stores, Inc. v. Big Daddy's Family Music Center*, 109 F.3d 275, 280 (6th Cir. 1997.) In general, the stronger the mark, the greater the likelihood of confusion. *Id.*

In this case, the "Dominic's" mark is strong as it relates to Dominic's restaurant and the services provided thereby. Not only was Dominic's restaurant in business for over fifty (50) years at the same location, it had a national reputation as Dayton's best Italian restaurant and served customers from outside the Dayton area and outside Ohio. (Motion; Anne Mantia Aff.) Finally, the restaurant has used "widespread" media advertising and has been the subject of

multiple news articles in the Dayton Daily News and other print media. (Anne Mantia Aff.)

## ii.    Relatedness of the Goods

The Sixth Circuit has used three (3) criteria for testing the relatedness factor. *AutoZone*, 373 F.3d at 797 (citing *Kellogg Co. v. Toucan Golf, Inc.*, 337 F.3d 616, 624 (6th Cir. 2003)). The three (3) criteria are: (1) if the parties compete directly, confusion is likely if the marks are sufficiently similar; (2) if the goods and services are somewhat related, but not competitive, then the likelihood of confusion will turn on other factors; and (3) if the products are unrelated, confusion is highly unlikely. *Id.* Thus, the relatedness factor focuses on whether goods or services with comparable marks that are similarly marketed and appeal to common customers are likely to lead consumers to belief that they come from the same source or are somehow connected with or sponsored by a common company. *Id.* (citing *Therma-Scan, Inc. v Thermoscan, Inc.*, 295 F.3d 623, 636 (6th Cir. 2002)).

In this case, there is a likelihood that, if the Defendants use one or both of the Dominic's marks, they will be competing directly. Thus far, the Defendants have incorporated a business under the name of Dominic's Restaurant, Inc. and indicated to the media that they are opening a new restaurant in the Dayton area that will feature the original recipes from Dominic's. The name of the new restaurant is thus far unsaid.

Thus, for purposes of determining whether to restrain the use of the "Dominic's" marks, the Court will assume, on good basis, that the Defendants have used and will be using the "Dominic's" marks regarding a restaurant. If the Defendants use the "Dominic's" mark, they are likely to lead consumers to believe that they come from the same source as the "Dominic's" marks and are connected with or sponsored by a common company.

-16-

### iii.    Similarity of the Marks

When examining similarity, courts should examine the pronunciation, appearance, and verbal translation of conflicting marks. *AutoZone*, 373 F.3d at 795. A side-by-side comparison is not necessarily appropriate and courts must determine whether a given mark would confuse the public when viewed alone. *Id.*

In this case, the marks being considered for purposes of this TRO are identical. The mark being considered for both Plaintiffs and Defendants is "Dominic's." Therefore, there is a strong likelihood that the public would be confused.

### iv.    Evidence of Actual Confusion

Evidence of actual confusion is obviously the best evidence of a likelihood of confusion but is not required. *AutoZone*, 373 F.3d at 798. However, thus far, no evidence of actual confusion has been submitted. Therefore, this factor is not relevant to the determination of the likelihood of confusion.

### v.    Marketing Channels Used

This factor considers how and to whom the respective goods or services of the parties are sold. *Champions Golf Club, Inc. v. The Champions Golf Club, Inc.*, 78 F.3d 1111, 1120 (6th Cir. 1996)(citing *Homeowners*, 931 F.2d at 1110). Dissimilarities between the predominant customers of a plaintiff's and a defendant's goods or services lessens the possibility of confusion. *Id.*

Plaintiffs and Defendants have and are using the same local media that has covered Dominic's restaurant for more than fifty (50) years. Further, since both Dominic's restaurant and the restaurant that the Defendants have announced that they are opening are in the same

geographical area and have and are offering the same type of food, the customers can reasonably be expected to be the same. The marketing channels are or will be very similar if not identical.

## vi.     Likely Degree of Purchaser Care

The standard normally used to determine the likely degree of purchaser care is the typical buyer exercising ordinary caution. *Champions*, 78 F.3d at 1120. When goods or services are sold to more sophisticated buyers or when the goods or services are expensive or unusual, other things being equal, there is less likelihood of confusion. *Id.* By the same token, the less care that a purchaser is likely to take in comparing products or services, the greater likelihood of confusion. *Wynn Oil Co. v. American Way Service Corp.*, 943 F.2d 595, 602 (6th Cir. 1991).

In this case, there is a minimum likely degree of purchaser care and thus a likelihood of confusion. The good or services are not necessarily expensive and are not unusual and most of the customers are not likely to be more sophisticated than any typical restaurant customer would be.

## vii.    Defendant's Intent In Selecting the Mark

Proving intent is not necessary to demonstrate the likelihood of confusion but the presence of intent strengthens the likelihood of confusion. *AutoZone*, 373 F.3d at 799. Further, circumstantial evidence of copying, particularly the use of a contested mark with knowledge of the protected mark, is sufficient to support an inference of intentional infringement. *Id.* A defendant who purposely chooses a particular mark because it is similar to that of an existing mark "is saying, in effect that he thinks there is at least a possibility that he can divert some business from the existing user and the defendant ought to know at least as much about the likelihood of confusion as the trier of fact." *Little Caesar Enterprises, Inc. v. Pizza Caesar, Inc.*,

834 F.2d 568, 572 (6th Cir. 1987).

In this case, there is at least circumstantial evidence that the Defendants intend to copy the "Dominic's" mark. Christie Mantia and Lee were well aware of the existence of Dominic's restaurant for a long period of time. Powers has incorporated a business under the name of Dominic's Restaurant, Inc. and the Defendants have indicated to the media that they are opening a new restaurant in the Dayton area that will feature the original recipes from Dominic's.

**viii.    Likelihood of Expansion of the Product Lines**

This factor concerns expansion in the types of services offered by the parties. *Champions*, 78 F.3d at 1121. A strong possibility that either party will expand his or her business to compete with the other or be marketed to the same consumers weighs in favor of a likelihood of confusion. *Id.* However, a finding that neither party will expand does not address whether there is a likelihood of confusion. *Id.* Thus, an affirmative finding of the likelihood of expansion provides a strong indication of a likelihood of confusion while a negative finding is not a strong indication that there will not be a likelihood of confusion. *Id.*

As indicated above, there is a strong possibility that the Defendants will expand, or in this case, begin, their business to compete with the "Dominic's" marks and will be marketing to the same customers. Therefore, this factor weighs in favor of a likelihood of confusion.

**c.    Conclusion**

There is a strong likelihood that the Plaintiffs will be successful on their mark infringement claims. The "Dominic's" marks are protectable. Further, all of the relevant factors considered weigh in favor of a likelihood of confusion and none of the factors weigh against a likelihood of confusion.

2.      **Share Redemption Agreement**

Plaintiffs argue that Christie Mantia is violating the express terms and conditions of the Share Redemption Agreement. In the Share Redemption Agreement, Christie Mantia agreed to terminate her employment relationship with Dominic's and agreed that she would not "in any manner, directly or indirectly in connection with any business of any kind, use the name Dominic's or any logos associated with its restaurant." In return, she was paid a total of $460,000 by Dominic's.

A non-compete agreement that is reasonable is enforceable. *Raimonde v. Van Vlerah*, 325 N.E.2d 544, 547 (Ohio 1975). A non-compete agreement is reasonable under Ohio law if three (3) conditions are met: (1) it goes no further than necessary to protect the legitimate interest of the employer; (2) it does not impose undue hardships on the employee; and (3) it is not injurious to the public. *Id.* To show a likelihood of success on the merits on this claim, then, the Plaintiffs must show that there is a likelihood that the Share Redemption Agreement is reasonable and that there is a likelihood that Christie Mantia has breached the Share Redemption Agreement.

The Plaintiffs in this case argue that the Share Redemption Agreement is a reasonable non-compete agreement because it does not preclude Christie Mantia from competing, only from unfairly competing. The Share Redemption Agreement merely precludes Christie Mantia from using the Dominic's name, logos or images.

The only argument offered thus far by Christie Mantia is that the share agreement is not reasonable because it does not include any time limitations. It is true that the Share Redemption Agreement does not include any time restrictions on opening or working in a restaurant. This, of course, does not make the Share Redemption Agreement unreasonable because it does not

include any time restrictions. Having no time restrictions on Christie Mantia's ability to earn a livelihood is not unreasonable and is, in fact, very reasonable. The Plaintiffs have shown a likelihood that the Share Redemption Agreement is reasonable.

The Plaintiffs have also shown that Christie Mantia has violated the Share Redemption Agreement and may continue to do so to a greater extent in the future. There is evidence that Powers has incorporated a business under the name of Dominic's Restaurant, Inc. and that Powers, Lee and Christie Mantia are going to open a restaurant. Further, they have indicated to the media that they are opening a new restaurant in the Dayton area that will feature the original recipes from Dominic's.[3]

By asserting to the media that she intended to use the "Dominic's" name and was bringing the Dominic's name back is likely to be a violation of the Share Redemption Agreement. The Plaintiffs have shown a likelihood of success on their claim that Christie Mantia has breached the Share Redemption Agreement.

### 3.     Ohio Uniform Trade Secrets Act

The purpose of Ohio's trade secret law is to maintain commercial ethics, to encourage invention, and to protect employers' investments and proprietary information. *Levine v. Beckman*, 548 N.E.2d 267, 271 (Ohio Ct. App. 1988). Under Ohio law, an actual or threatened misappropriation of trade secrets may be enjoined. Ohio Rev. Code § 1333.62.

In Ohio, a trade secret is defined as:

[I]nformation, including the whole or any portion or phase of any scientific or technical information, design, process, procedure, formula, pattern, compilation,

_____

[3]The use of recipes learned in the past is not, itself, violative of the Share Redemption Agreement, but calling them "Dominic's" recipes may be.

-21-

program, device, method, technique, or improvement, or any business information or plans, financial information, or listing of names, addresses, or telephone numbers, that satisfies both of the following:

(1) It derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use.

(2) It is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

Ohio Rev. Code § 1333.61

When determining whether a trade secret exists, a court considers: (1) the extent to which the information is known outside the business; (2) the extent to which it is known to those inside the business; (3) the precautions taken by the holder of the trade secret to guard the secrecy of the information; (4) the savings effected and the value to the holder in having the information withheld from competitors; (5) the amount of effort or money expended in obtaining and developing the information; and (6) the amount of time and expense it would take for others to acquire and duplicate the information. *Proctor & Gamble Co. v. Stoneham*, 747 N.E.2d 268, 272 (Ohio Ct. App. 2000).

Further, in actions to enforce covenants not to compete, Ohio courts hold that an actual threat of harm exists when an employee possesses knowledge of an employer's trade secrets and begins working in a position that causes him or her to compete directly with the former employer. *Id* at 274. Thus, a threat of harm warranting injunctive relief may be shown by establishing that an employee with detailed and comprehensive knowledge of an employer's trade secrets and confidential information has begun employment with a competitor of the former employer in a position that is substantially similar to the position held during the former employment. *Id.*

Thus, to show a likelihood of success on the merits in this case, the Plaintiffs must show that there was a trade secret, that they owned the trade secret and that there is an actual threat of harm. The Plaintiffs argue that their marketing, strategies, production and methods of operation constitute trade secrets under Ohio law and that Christie Mantia possess these alleged trade secrets. Plaintiffs make no argument about the other Defendants regarding the OUTSA.

Powers and DRI respond that methods of operation such as; using fresh, carefully cut vegetables; purchasing only the best ingredients; and making fresh products on a daily basis are not trade secrets. Powers and DRI say nothing about marketing, strategies and production.

The Plaintiffs have shown that there is a likelihood that Christie Mantia may have been exposed to Dominic's Restaurant's trade secrets, to the extent that Dominic's Restaurant had trade secrets, and that there is a likelihood that Christie Mantia has told the media that she will begin working in a position with a competitor of the former employer in a position that is substantially similar to the position held with the former employer. However, the Court has not been given enough information to ascertain what specific trade secrets were in place at Dominic's Restaurant.

While Ohio law permits the Court to enjoin an actual or threatened misappropriation of trade secrets, the Court must be able to determine whether there are trade secrets. Without identifying specific trade secrets, the Court cannot determine whether the Plaintiffs will likely succeed on this claim.

Thus, the Plaintiffs have shown a likelihood of success on their mark infringement claims and on their claims based upon the Share Redemption Agreement, but not their OUTSA claims. The next factor to be considered regarding whether to grant a TRO is whether the Plaintiffs

would suffer irreparable injury without the injunction

## C.    **Irreparable Injury**

"In general, a party seeking an injunction must show that, absent the injunctive relief, he or she would suffer irreparable harm." *Wynn Oil Co. v. American Way Service Corp.*, 943 F.2d 595, 608 (6th Cir. 1991). However, in the context of an infringement action, a finding of a likelihood of confusion or possible risk to reputation usually results in irreparable injury. *Id.* "The irreparable injury usually flows 'both from the potential difficulty of proof of plaintiff's damages, and also from the impairment of intangible values….'" *Id.*(quoting *Koppers Co., Inc. v. Krupp-Koppers GmbH*, 517 F. Supp. 836, 849 (W.D. Pa. 1981)). The intangible values include damage to reputation that may result from the inability of the victim to control the nature and quality of the defendant's goods. *Processed Plastic Co. v. Warner Communications, Inc.*, 675 F.2d 852, (7th Cir. 1982).

In this case, Plaintiffs have shown a likelihood of confusion regarding the "Dominic's" marks. If the Defendants are permitted to continue to use the "Dominic's" marks, there is a likelihood that Plaintiffs will suffer, among other things, damages to their reputation that cannot be fairly recognized by a monetary award.

This same reasoning would apply to Christie Mantia's covenant not to compete as set forth in the Share Redemption Agreement. There is a likelihood that Plaintiffs will suffer, among other things, damages to their reputation that cannot be fairly recognized by a monetary award if Christie Mantia violates her covenant. *See Raimonde*, 325 N.E. 2d 544 (reasonable covenants not to compete are subject to injunctive relief).

Powers and DRI argue that the longstanding rule that a court typically needs to only find

infringement for it to award injunctive relief **may** have been displaced by the United States Supreme Court's decision in *eBay,* 547 U.S. 388. In *eBay*, the Supreme Court vacated a lower court opinion that granted a permanent injunction because the lower court did not directly address all of the factors, specifically irreparable harm, that must be shown to obtain a permanent injunction. *Id.* at 394. The court below had applied the longstanding rule that an injunction normally follows proof of infringement and validity.

However, *eBay* is inapplicable here for two reasons. First, the Supreme Court in *eBay* was addressing permanent injunctive relief and not a TRO as is being addressed here. Second, here, the Court has addressed irreparable harm and has not only concluded that irreparable harm automatically flows from a finding of infringement and validity.

Thus, this factor weighs in favor of granting a TRO. The next factor to be considered regarding whether to grant a TRO is whether the issuance of the injunction would cause substantial harm to others.

### D.     Substantial Harm To Others

"In a trademark case, if the movant can show a likelihood of success, then the harm to others caused by an injunction will likely consist in part of the non-movant's lost profits from sales of the apparently infringing articles and a loss of the money expended on promotional materials and advertising." *Worthington Foods*, 732 F. Supp. at 1461. However, such harm to apparent infringers is not entitled to consideration. *Id.*(citing *Central Benefits Mutual Insurance Co. v. Blue Cross and Blue Shield Association*, 711 F. Supp. 1423, 1435 (S.D. Ohio 1989)).

In this case, the Plaintiffs argue that the only entities that may be harmed by a TRO are the Defendants. The Defendants essentially agree arguing that they would be harmed by an

injunction against the use of the "Dominic's" mark will cause significant and substantial harm by delaying plans, increasing costs and perhaps preventing any opening of the restaurant that they plan to open. They further argue that would be harmed because they have spent in excess of $10,000 for signage.

Since harm to an apparent infringer is not entitled to consideration and no other harm is argued nor is this Court aware of any other harm to others, this factor weighs in favor of granting a TRO. The final factor to be considered regarding whether to grant a TRO is whether the public interest would be served by issuance of a TRO.

**E.    Public Interest Served**

If an injunction would bring disastrous results to the public, a TRO may not be appropriate even if all of the other factors weigh in favor of granting a TRO. *Worthington*, 732 F. Supp. at 1463. However, if a TRO would create a public benefit by, for example, enjoining some seriously injurious activity, the public interest would favor granting the TRO. *Id.*

In a trademark case, for instance, public policy concerns may weigh in favor of granting a TRO because a TRO could stop confusion in the marketplace. *Id.* If the plaintiff has shown a likelihood of confusion concerning the source, affiliation, connection or sponsorship of the goods or services, granting a TRO would avoid further confusion and thus be in the public interest. *Id.*

In this case, the Plaintiffs have shown a likelihood of confusion regarding the "Dominic's" marks. Granting a TRO would avoid further confusion regarding these marks and would thus be in the public interest.

The Defendants argue that denying a TRO favors the public interest because Anne

Mantia has recently acknowledged in public, "I'm happy that some Dominic's-style recipes will be available to the public." What the Defendants did not include however is, as part of this same public statement, Anne Mantia said that she has no connection to the new restaurant and has not ruled out opening a successor to Dominic's herself. "I'd love to have a Dominic's-style restaurant in Dayton. I've been talking to people for a long time and waiting to see what happens with the economy. If the right opportunity comes along, I'd like to do it."

Thus, the Defendant's argument that denying a TRO favors the public interest is, when all is considered, without merit. This factor weighs in favor of granting a TRO.

**F.     Conclusion Regarding TRO**

All four (4) of the factors to be considered weigh in favor of issuing a TRO regarding Plaintiffs' mark infringements and Plaintiffs' Share Redemption Agreement claim. Plaintiffs have shown a likelihood of success on the merits, irreparable injury, a lack of substantial harm to others and that the public interest would be served by the issuance of a TRO.

Plaintiffs have not shown a likelihood of success on the merits of their OUSTA claim and are, therefore, not entitled to a TRO regarding that claim.

**III.     SUMMARY**

This Court has federal question subject matter jurisdiction over Plaintiffs' service mark infringement claim and has pendent jurisdiction over Plaintiffs' remaining claims. Further, all four (4) of the factors to be considered when deciding whether to issue a TRO weigh in favor of issuing a TRO regarding Plaintiffs' mark infringements and Plaintiffs' Share Redemption Agreement claim. However, Plaintiffs have not shown that they are entitled to a TRO on their OUTSA claim.

Therefore, **IT IS HEREBY ORDERED, ADJUDGED AND DECREED** that Defendants Dominic's Restaurant, Inc., Christie Mantia, Harry Lee and Reece Powers, III, and their agents, servants, employees, assigns, representatives and successors and all persons in active concert or participation with them are hereby ordered:

1.    To refrain from advertising, marketing, promoting, selling, shipping or distributing, without Dominic's consent, any product utilizing the Dominic's name, likeness, or image or any name, likeness, or image in any trade dress, trade mark or service mark, confusingly similar thereto; and

2.    To refrain from making any commercial use of the Dominic's marks or any marks confusingly similar thereto; and

3.    To refrain from falsely designating the origin of or infringing upon Dominic's marks by the use of the Dominic's name, image, likeness or logos; and

4.    To immediately remove all graphics controlled by the Defendants that depict the name, likeness, or image of Dominic's marks or marks that are confusingly similar to the Dominic's marks.

**IT IS FURTHER ORDERED, ADJUDGED AND DECREED** that the Plaintiffs are to post a bond of $10,000, the amount that the Defendants have allegedly expended on signage.

**IT IS FURTHER ORDERED, ADJUDGED AND DECREED** that this Temporary Restraining Order shall become effective upon entry of this Order and shall remain in effect until the Court issues an Order regarding Plaintiffs' request for a Preliminary Injunction. Plaintiffs' request for a Preliminary Injunction is set for hearing at 8:30 a.m. on Friday, April 24, 2009.

**DONE** and **ORDERED** in Dayton, Ohio this Twentieth day of April, 2009.

**s/Thomas M. Rose**
_____
THOMAS M. ROSE
UNITED STATES DISTRICT JUDGE

Copies furnished to:

Counsel of Record